Dyk, Circuit Judge, concurring.
I fully join the panel opinion but write separately to describe in greater detail the history of inter partes review proceedings, history that confirms that those proceedings are not adjudications between private parties. While private parties play a role, inter partes reviews are fundamentally agency reconsiderations of the original patent grant, proceedings as to which sovereign immunity does not apply.
As the panel makes clear, it is well established that tribes cannot assert sovereign immunity in proceedings brought *1330 by the federal government.[1] This understanding is reflected in Federal Maritime Commission v. South Carolina State Ports Authority (" FMC "), which dealt with a proceeding conducted by the Federal Maritime Commission adjudicating a private party's claim that a state-run port had violated a federal statute in which the private party sought monetary and injunctive relief. 535 U.S. 743, 747-49, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002). "[T]he only duty assumed by the FMC, and hence the United States, in conjunction with [the] private complaint [was] to assess its merits in an impartial manner." Id. at 764, 122 S.Ct. 1864.
The Supreme Court held that state sovereign immunity barred the FMC from adjudicating the complaint, but noted that it would not bar the FMC from "institut[ing] its own administrative proceeding against a state-run port," even if that proceeding were prompted by "information supplied by a private party." Id. at 768, 122 S.Ct. 1864. Private parties, the Court explained, "remain perfectly free to complain to the Federal Government about unlawful state activity and the Federal Government [remains] free to take subsequent legal action." Id. at 768 n.19, 122 S.Ct. 1864.
Under FMC , it is clear that sovereign immunity cannot bar agency denial of an original patent application filed by a sovereign entity or, consequently, agency reconsideration of an original patent grant. Such reconsideration simply does not involve agency adjudication of a private dispute, but rather agency reconsideration of its own prior actions.
At oral argument, counsel for the tribe acknowledged that sovereign immunity would not apply in either ex parte or inter partes reexamination proceedings, and even suggested that the USPTO could continue to provide post-grant review of tribe-owned patents by simply converting the inter partes reviews to ex parte reexaminations. Oral Arg. 6:30-7:08, 54:48-55:15. But inter partes review is not fundamentally different from other reexamination procedures. Rather, inter partes review is a direct successor to ex parte and inter partes reexamination. It shares many of the same procedural features and is designed to address the same problems. And like the reexaminations from which it descends, it is fundamentally agency reconsideration, assisted by third parties, rather than agency adjudication of a private dispute.
Post-grant administrative review of issued patents is a relatively new feature of the patent system. It was first enacted in 1980 to address longstanding concerns about the reliability of the original examination process. Patlex Corp. v. Mossinghoff , 758 F.2d 594, 603 (Fed. Cir. 1985). Before reexamination procedures, once a patent was issued, "there was no way the PTO or private persons could have forced ... patents back into the examination phase against [the patent owner's] will."
*1331 Id. at 601.[2] This was problematic because the USPTO-then and now-is an agency with finite resources that sometimes issues patents in error. Currently, for instance, the USPTO receives over 600,000 applications a year. U.S. Patent & Trademark Office, Performance & Accountability Report 169 tbl.2 (2017). Patent examiners receive roughly 22 hours to review each application, an amount of time that 70% of examiners report as insufficient. See U.S. Gov't Accountability Office, GAO-16-490, Patent Office Should Define Quality, Reassess Incentives, and Improve Clarity 10, 25-26 (2016). And the USPTO struggles to attract and retain examiners with the technical competence required to understand the inventions being reviewed and to perform sufficiently thorough prior art searches. See U.S. Gov't Accountability Office, GAO-16-479, Patent Office Should Strengthen Search Capabilities and Better Monitor Examiners' Work 28-29 & n.50 (2016).
In considering the enactment of reexamination, Congress was well aware of constraints on the accuracy of initial examination and the adverse effects of the issuance of bad patents. The Senate report on patent reexamination emphasized that the USPTO faced "a situation where a limited staff is trying to cope with a constantly increasing workload and is under pressure to make speedy determinations on whether or not to grant patents." S. Rep. No. 96-617, at 8 (1980); see also Patent Reexamination: Hearing on S. 1679 Before the Comm. on the Judiciary , 96th Cong. 3 (1980) (statement of Sen. Bayh) (characterizing the USPTO as "an understaffed and overworked office trying to handle an ever increasing workload."). The USPTO Commissioner testified that these resource constraints led to uncertainty in the patent system "because pertinent prior patents and printed publications ... often are discovered only after a patent has issued and become commercially important." S. Rep. No. 96-617, at 9 (1980). The Commissioner also explained that
The main reason reexamination is needed is because members of the public interested in the validity of a patent are sometimes able to find pertinent prior patents and printed publications not known or available to the PTO....
The patent owner's competitors will devote great effort and expense to invalidating a patent that affects their business. They can afford to look for documentary evidence of unpatentability in library collections, technical journals and other sources not within the PTO's search file. Because of budgetary and time constraints, the examiner's search seldom extends beyond the PTO's 22 million document collection.
Industrial Innovation and Patent and Copyright Law Amendments: Hearing on H.R. 6033, H.R. 6934, H.R. 3806, and H.R. 2414 Before the Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary , 96th Cong. 576 (1981) (statement of Sidney A Diamond, Commissioner of Patents and Trademarks).[3] In short, given the high volume of applications and the USPTO's manpower *1332 limitations, pre-grant patent examination was-and still is-an imperfect way to separate the good patents from the bad. Resource constraints in the initial examination period inevitably result in erroneously granted patents.[4]
As a result of these problems, there was a perception that the public lacked confidence in the patent system, which in turn contributed to judicial skepticism about the USPTO's work. See S. Rep. No. 96-617, at 3, 14 (1980). Indeed, "judicial opinions and commentaries from the time" evince "a fundamental lack of trust in the competency of the PTO to discover sources of relevant prior art and apply them properly under the statutory standards, particularly in the context of a confidential ex parte examination process." Mark D. Janis, Rethinking Reexamination: Toward A Viable Administrative Revocation System for U.S. Patent Law , 11 Harv. J.L. & Tech. 1, 9-10 (1997). This lack of confidence led to an undermining of the presumption of patent validity, as "many courts treated the presumption of validity as coextensive with the presumption of administrative correctness." Id. at 12.
Some kind of reexamination procedure was therefore desirable, particularly as to issues of anticipation and obviousness where prior art has always played a central role. "After reexamination," the Commissioner testified, "the presumptive validity of the patent as it leaves the reexamination process will be enhanced. The court will have greater confidence that the patent claims are of exactly the right scope and that any unpatentable original claims have been canceled." Industrial Innovation and Patent and Copyright Law Amendments: Hearing on H.R. 6033, H.R. 6934, H.R. 3806, and H.R. 2414 Before the Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary , 96th Cong. 580-81 (1981) (statement of Sidney A Diamond, Commissioner of Patents and Trademarks). Reexamination would allow the USPTO to cure its own errors, thereby improving patent quality, bolstering the presumption of patent validity, and restoring the public's and the judiciary's confidence in the USPTO.
In 1980, Congress enacted the Reexamination Act and created ex parte reexamination, the first post-issuance proceeding to review patent validity. See Act of Dec. 12, 1980, Pub. L. No. 96-517, 94 Stat. 3015 (1980). A request for ex parte reexamination could be filed by "any person at any time," including the patent owner, a third party, or the Director of the USPTO. 35 U.S.C. § 302 (1980). If the request raised "a substantial new question of patentability" based on prior art, the USPTO would *1333 grant the request and conduct reexamination. Id. at § 303(a). The USPTO would then cancel any claim of the patent determined to be unpatentable. Id. at § 307.
The objective of reexamination was to "strengthen[ ] investor confidence in the certainty of patent rights by creating a system of administrative reexamination of doubtful patents," H.R. Rep. No. 96-1307, pt. 1, at 3 (1980), and to "permit efficient resolution of questions about the validity of issued patents without recourse to expensive and lengthy infringement litigation," id. at 4. In particular, reexamination aimed to use the motivation and resources of third parties to improve the accuracy of the USPTO's patent process. See S. Rep. No. 96-617, at 2 (1980) (explaining that reexamination "will help to restore confidence in the effectiveness of our patent system by efficiently bringing to the PTO's attention relevant [prior art] materials that are missing or have been overlooked."). "The problem," the Senate report concluded, "is to insure that the patent examiner has the materials needed for a complete examination and patent reexamination will help to get these materials before him." Id. at 3.
Nevertheless, ex parte reexamination had several limitations with the result that it was rarely used. H.R. Rep No. 106-464, at 133 (1999). First and foremost, a "third party challenger had no role once the proceeding was initiated while the patent holder had significant input throughout the entire process." S. Rep. No. 110-259 at 18 (2008). Additionally, there was no right for a requestor to appeal the USPTO's reexamination decision either administratively or in court. Id. at 19.
In light of these deficiencies, Congress sought to introduce a new system that would make reexamination more effective and broaden its use. H.R. Rep 106-464 at 133 (1999). In 1999, it enacted a new procedure, known as inter partes reexamination, adding to the 1980 Reexamination Act's ex parte option. Act of Nov. 29, 1999, Pub. L. No. 106-113, 113 Stat. 1501 (1999). Inter partes reexamination allowed a third party to file a request for reexamination based on prior art, and if a substantial new question of patentability was raised, the USPTO would grant the request and proceed with reexamination. 35 U.S.C. § 312 (2002). Unlike ex parte reexamination, however, inter partes reexamination allowed third party requesters to participate in the process by providing that "[e]ach time that the patent owner files a response to an action on the merits from the Patent and Trademark Office, the third-party requester shall have one opportunity to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto." Id. at § 314. It also permitted a requester to appeal an examiner's determination that the reexamined patent is valid to the Board of Patent Appeals and Interferences. "The participation by third parties [was] considered vital" to the goal of "improving patent quality and validity" because "in many circumstances they [would] have the most relevant prior art available and incentive to seek to invalidate an allegedly defective patent." H.R. Rep. 107-120, at 4 (2001).
Over the next few years, Congress revised inter partes reexamination in an attempt to make it more effective. In 2002, the procedure was amended to allow requests based solely on prior art already considered by the USPTO, Pub. L. 107-273, § 13105, 116 Stat. 1758, 1900 (2002), and to provide the same appellate review opportunities to patentees and third-party requesters. Id. at § 13202, 116 Stat. 1899-1906. Ultimately, however, both ex parte *1334 and inter partes reexamination were less widely used than Congress had hoped, and had features that made them "troublesomely inefficient and ineffective as a truly viable alternative for resolving questions of patent validity." S. Rep. No. 110-259 at 19 (2008).
It was against this background that, in 2011, Congress enacted the Leahy-Smith America Invents Act, which replaced inter partes reexamination with new post-grant review procedures, such as inter partes review, covered business method review, and post-grant review, while retaining ex parte reexamination. See Pub. L. No. 112-29, § 6, 125 Stat. 284, 299-304 (2011). Inter partes review in particular was designed to improve upon the inter partes reexamination process. Cuozzo Speed Techs., LLC v. Lee , --- U.S. ----, 136 S.Ct. 2131, 2137, 195 L.Ed.2d 423 (2016).[5] Similar to reexamination, the purpose behind creating inter partes review was to "improve patent quality and restore confidence in the presumption of validity." H.R. Rep. 112-98, pt. I, at 48 (2011).
Inter partes review, like inter partes reexamination, begins with a third party's filing a petition challenging the validity of one or more claims in a patent on the basis of prior art. The USPTO may institute review if the petitioner demonstrates a "reasonable likelihood that [it] would prevail" in the dispute, rather than instituting if it demonstrates a "substantial new question of patentability," as was the case in reexamination. See 35 U.S.C. § 314(a). Like inter partes reexamination, the third party remains involved throughout the proceeding, but inter partes review can include discovery and an oral hearing in addition to written comments. It is conducted before the Patent Trial and Appeal Board rather than an examiner. § 316(c).
In inter partes review, the federal agency tasked with patent examination of patent applications takes a "second look" at its own decision to issue a patent. As the Supreme Court concluded in Cuozzo :
[T]he purpose of [inter partes review] is not quite the same as the purpose of district court litigation. The proceeding involves what used to be called a reexamination (and, as noted above, a cousin of inter partes review, ex parte reexamination, 35 U.S.C. § 302 et seq. , still bears that name). The name and accompanying procedures suggest that the proceeding offers a second look at an earlier administrative grant of a patent. Although Congress changed the name from "reexamination" to "review," nothing convinces us that, in doing so, Congress wanted to change its basic purposes, namely, to reexamine an earlier agency decision.
136 S.Ct. at 2144 ; see also Patlex , 758 F.2d at 604 (explaining that ex parte reexamination's "purpose is to correct errors made *1335 by the government, to remedy defective governmental (not private) action, and if need be to remove patents that should never have been granted.").
While inter partes review has some features similar to civil litigation, see SAS Institute Inc. v. Iancu , --- U.S. ----, 138 S.Ct. 1348, 1352, 200 L.Ed.2d 695 (2018), at its core, it retains the purpose and many of the procedures of its reexamination ancestors, to which everybody agrees sovereign immunity does not apply. Inter partes review is an administrative proceeding designed to improve patent quality by giving the USPTO "a second look at an earlier administrative grant of a patent." Cuozzo , 136 S.Ct. at 2144 ; see also Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC , --- U.S. ----, 138 S.Ct. 1365, 1374, 200 L.Ed.2d 671 (2018) ("The primary distinction between inter partes review and the initial grant of a patent is that inter partes review occurs after the patent has issued.").
As the panel describes, significant features of the system confirm that inter partes review is an agency reconsideration rather than an adjudication of a private dispute and does not implicate sovereign immunity. Inter partes review brings to bear the same agency expertise as exists in initial examination. There is no requirement that a third party petitioner have any interest in the outcome of the proceeding, much less Article III standing. See 35 U.S.C. § 311(a). Upon receiving a petition, the Director has complete discretion regarding whether to institute review. § 314 ; Oil States , 138 S.Ct. at 1371. The inter partes review procedures limit discovery, typically preclude live testimony in oral hearings, and do not mirror the Federal Rules of Civil Procedure. § 316(a)(5); see also 37 C.F.R. §§ 42.51, 42.70 ; Ultratec, Inc. v. CaptionCall, LLC , 872 F.3d 1267, 1270 n.2 (Fed. Cir. 2017). And if the third party settles, the proceeding does not end, and the USPTO may continue on to a final written decision. § 317(a). The USPTO may intervene to defend its decisions on appeal, whether or not the third party petitioner remains in the case. § 143 ; Cuozzo , 136 S.Ct. at 2144. It does not involve exercise of personal jurisdiction over the patent holder or adjudication of infringement. The only possible adverse outcome is the cancelation of erroneously granted claims. Notably, the Supreme Court has held that "adversarial proceedings" that do not involve the exercise of personal jurisdiction do not necessarily raise sovereign immunity concerns. See Tenn. Student Assistance Corp. v. Hood , 541 U.S. 440, 448, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004) (bankruptcy).
These features distinguish inter partes review from the proceeding in FMC and bolster the view that it is, like ex parte and inter partes reexamination, an executive proceeding that enlists third-party assistance. As the panel concludes, in such a reexamination proceeding, sovereign immunity does not apply.

See Washington v. Confederated Tribes of Colville Indian Reservation , 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (holding that tribal sovereignty is "dependent on, and subordinate to" the Federal Government); Pauma v. NLRB , 888 F.3d 1066, 1078-79 (9th Cir. 2018) (holding that tribal immunity does not preclude a proceeding brought "on behalf of the NLRB, an agency of the United States, to enforce public rights"); NLRB v. Little River Band of Ottawa Indians Tribal Gov't , 788 F.3d 537, 555 (6th Cir. 2015).

The USPTO did have the authority to reissue patents to cure errors in the original. See Grant v. Raymond , 31 U.S. (6 Pet.) 218, 244, 8 L.Ed. 376 (1832) ; see also 35 U.S.C. § 251. However, reissue proceedings could only be initiated at the request of the patentee, so they were of limited use in ensuring patent quality. See Russell E. Levine et. al., Ex Parte Patent Practice and the Rights of Third Parties , 45 Am. U. L. Rev. 1987, 2008 (1996).

See also Thomas E. Popovich, Patent Quality: An Analysis of Proposed Court, Legislative, and PTO-Administrative Reform-Reexamination Resurrected (Part I), 61 J. Pat. Off. Soc'y 248, 269 (1979) (concluding that the issuance of low quality patents was attributable to the USPTO's failure to discover and adequately to consider the most relevant prior art and that patent reform should be directed at these failures).

See U.S. Gov't Accountability Office, GAO-16-490, Patent Office Should Define Quality, Reassess Incentives, and Improve Clarity 25 (2016) (reporting that "examiners' time pressures are one of the central challenges for patent quality"); see also Michael D. Frakes & Melissa F. Wasserman, Does the U.S. Patent and Trademark Office Grant Too Many Bad Patents?: Evidence from a Quasi-Experiment , 67 Stan. L. Rev. 613, 652-53 (2015) (finding increased patent grant rates correlated with increased resource strain on the USPTO); Shawn P. Miller, Where's the Innovation: An Analysis of the Quantity and Qualities of Anticipated and Obvious Patents , 18 Va. J.L. & Tech. 1, 45 (2013) (estimating that 28% of issued patents would be invalidated as anticipated or obvious).

The proceedings created by the AIA continued Congress' efforts to channel the work of third party challengers in order to help the USPTO achieve its mission. See H.R. Rep. No. 112-98, pt. I, at 39-40 (2011) (characterizing post-grant proceedings as "a more efficient system for challenging patents that should not have issued"). Indeed, the AIA also expanded the role of private parties in the pre-grant examination process. Previous USPTO procedure allowed third parties to submit prior art patents and other printed publications of potential relevance to a pending examination but did not allow explanations of "why the prior art was submitted or what its relevancy might be." Id. at 48-49. In an effort to better capitalize on the assistance of third parties, the AIA removed this restriction and provided a mechanism for third parties to explain the relevance of prior art they bring to the USPTO's attention. Id. at 49.